UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA HOLT, | ) | Case No.: 1:19 CV 1495 |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| SECRETARY OF VERTERANS', | ) | |
| AFFAIRS, DENIS MCDONOUGH, | ) | |
| | ) | |
| Defendant | ) | ORDER |

Currently pending before the court in the above-captioned case is Defendant Secretary of Veterans' Affairs Denis McDonough's ("Defendant") Motion for Summary Judgment ("Motion"), pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") with respect to Plaintiff Melissa Holt's ("Plaintiff", also known as "Melissa McKee")  three counts for relief. (ECF No. 27.) For the following reasons, the court grants Defendant's Motion (ECF No. 27).

## I.  BACKGROUND

### A. Factual Background

Plaintiff is an employee of the Louis Stokes Cleveland Veterans' Affairs ("VA") Medical Center in Cleveland, OH. (Mot. at PageID #143, ECF No. 27-2.) Plaintiff began her career at the VA in 2008 or 2009 as a student trainee, and held various positions until she applied to become an Environmental Protection Specialist ("EPS") in the Office of Occupational Health and Safety ("OHS") in 2016. (*Id.*) In 2016, prior to Plaintiff's applying for the EPS position, the VA spilt the

EPS position into two separate positions, a GS-9 recycling coordinator position and a GS-11 EPS role, following Don Albaugh's ("Albaugh") retirement, who served both roles. (*Id.* at PageID #143–144; Burke Tr. 86:18–87:10, ECF No. 27-6.) Following the job reclassification, the VA announced its vacancy for the two positions, including their pay scales, after which, Plaintiff applied in the spring of 2016, for the EPS position within OHS. (*Id.*; Ex. E, ECF No. 27-7.) Despite being advertised as a GS-11 position, Plaintiff alleges that a fellow employee—Dan Mashek ("Mashek") a Safety Specialist and Emergency Preparedness Manager in OHS—told her that the position would initially be compensated as a GS-9-11 with opportunities to advance to GS-12. (Mot. at PageID #144, ECF No. 27-2.; McKee Tr. 44:14–46:17, ECF No. 27-3.) Plaintiff alleges she had similar conversations with other employees within OHS. (*Id.*) After applying and interviewing, Plaintiff was offered the EPS position at a compensation level of GS-11, which she subsequently accepted. (*Id.*)

Plaintiff began working as an EPS in OHS in July, 2016, and for the first two years received positive ratings from her manager John Harlach ("Harlach"), whom she described as a "hands off" manager. (*Id.*) However, Plaintiff experienced friction working with Mashek, whom she alleges made disparaging comments towards women, prompting Plaintiff to report Mashek's alleged behavior. (*Id.* at. PageID #145; *see also* McKee Tr., ECF No. 27-3.) Harlach investigated Plaintiff's claims about Mashek, and ultimately concluded that no harassment occurred within the department. (*Id.*; Harlach Tr. 52:13–53:9, ECF No. 27-4.) Later, in 2017, Plaintiff approached Harlach about the possibility of being promoted to a GS-12. (*Id.*) After researching Plaintiff's request, Harlach found that there were no GS-12 EPS positions, but informed Plaintiff that she could perform a desk audit—a review of an employee's duties and responsibilities performed by an outside entity to determine whether an employee's position is accurately compensated. This might result in an

-2-

employee's compensation being upgraded to a G-S 12, downgraded, or remain the same. According to Harlach, Plaintiff failed to initiate this process. (*Id.*; Harlach Tr. 17:6–18:25, ECF No. 27-4; Ex. C, Gray Decl. ¶ 12, ECF No. 27-5.)

Thereafter, in late 2017, Marie Burke ("Burke") was selected as chief of OHS and became Plaintiff's supervisor in April, 2018. (Mot. at PageID #146, ECF No. 27-2.) According to the department, Burke had a more hands-on style of management than Harlach, and possessed greater technical expertise. (*Id.*; Ex. G, Fact Finding Report at PageID #674, ECF No. 27-9.) While Plaintiff and Burke initially had a friendly working relationship, Plaintiff alleges that their relationship changed following a presentation she gave, when Burke disagreed with Plaintiff's assessment of her job functions and responsibilities. (*Id.* at PageID #146–47.) Plaintiff further alleges that the relationship soured when she inquired about the possibility of being promoted to a GS-12, after attending a Green Environment Management System ("GEMS") coordinator conference where peers were being compensated at the GS-12 level. (*Id.*) According to Burke, she informed Plaintiff that the position had been downgraded nationally to a GS-11, and that Plaintiff's work performance needed improvement, which she believed should be the primary area of concern. (*Id.*) Following that meeting, Plaintiff met with David Sabol ("Sabol") on June 27, 2018, her second-line supervisor, and raised allegations of harassment and Burke's management style. (*Id.*)

Thereafter, Plaintiff alleges the relationship began to become further strained. (*Id.*) In her first mid-year assessment, Burke rated Plaintiff as "unsuccessful" in three out of four categories, as Burke believed that Plaintiff was not adequately performing her assigned duties. (*Id*; Ex. I, ECF No. 27-11.) In August 2018, Burke issued Plaintiff a letter of expectations regarding her job responsibilities. (*Id.* at PageID #149, Ex. S, ECF No. 27-21.) Meanwhile, simultaneously,  the EEO began investigating

-3-

an anonymous complaint made to the Quality Safety Value hotline, alleging that OHS suffered from a hostile work environment.(Mot. at PageID #149, ECF No. 27-2.)  During this same time frame, Plaintiff contacted the Office of Resolution Management, alleging that she had been subjected to workplace harassment and a hostile work environment. (Mot. at PageID 149–150, ECF No. 27-2.) Plaintiff subsequently filed an EEO complaint on September 27, 2018, alleging sex discrimination, hostile work environment, and reprisal. (*Id.*)

Meanwhile, Burke began issuing performance counseling and sick leave counseling letters to Plaintiff, as a means to address areas of Plaintiff's performance that needed improvement. (*Id.*) Beginning in late summer of 2018, after finding that Plaintiff's performance and communication failed to improve, Burke began issuing multiple reports of contact ("ROCs"), documenting Plaintiff's performance deficiencies.(*Id.* at PageID #150–51.) Despite issuing multiple ROCs, Burke did not suspend or discipline Plaintiff. (*Id.* at PageID #152.) In November or December, 2018, shortly before the year-end evaluation process, Plaintiff received a letter informing her that she had been temporarily reassigned to the biomedical engineering section due to "[Plaintiff's] continued failure to complete assignments which has placed the Agency at risk of potentially violating occupational health and safety standards." (Ex. Q at PageID #752, ECF No. 27-19.) However, Plaintiff's tour of duty and compensation remained the same. (*Id.*) Accordingly, given Plaintiff's repeated performance deficiencies, Burke assigned Plaintiff a rating of "unacceptable" for her 2018 performance evaluation, stating that Plaintiff had failed to carry out many critical duties of the EPS position. (*Id.*; Ex. N, ECF No. 27-16.)

After Plaintiff initiated a grievance process, Associate Director Beth Lumia ("Lumia") adjusted Plaintiff's 2018 performance rating to "fully successful" but noted that there "was clear

evidence of performance deficiencies". (*Id.*) In February, 2019, Plaintiff returned to OHS from her temporary reassignment. (Mot. at PageID #153, ECF No. 27-2.) According to Burke, despite Plaintiff's temporary reassignment, she continued to struggle in OHS with her duties and responsibilities. (*Id.*) Meanwhile, several investigations into OHS found no evidence of a hostile work environment. (*Id.*; Sabol Tr. 42:20–43:18, ECF No. 27-8.) However, Plaintiff sought another reassignment and transferred to a position within the quality management service. (Mot. at PageID #154, ECF No. 27-2.) Plaintiff was replaced by Albaugh, and subsequently another male, both of whom were compensated at the GS-11 level. (*Id.*)

### B. Procedural Background

Plaintiff filed her Complaint on June 28, 2019, alleging that the VA subjected her to unlawful sex discrimination (Count I) and retaliation (Count II) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and discriminatory pay (Count III) in violation of Title VII and the Equal Pay Act ("EPA"), 42 U.S.C. §§ 206 *et seq.* (Compl. ¶¶ 16–26, ECF No. 1.) On October 23, 2019, the court granted in part and denied in part Defendant's Motion to Dismiss (ECF No. 7), dismissing Plaintiff's EPA claim for lack of subject matter jurisdiction. On July 6, 2021, Defendant filed its Motion for Summary Judgment (ECF No. 27) on all of Plaintiff's claims. Plaintiff filed her Opposition (ECF No. 31) on September 24, 2021. Defendant filed its Reply in support of its Motion for Summary Judgment (ECF No. 34) on October 22, 2021.

### II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law. The court should state on the record the reasons for granting or denying the motion.

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determining whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of

production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*.

If the moving party meets its burden of production, then the non-moving party must point out specific facts in the record which create a genuine issue of material fact. *Zinn v. United States*, 885 F. Supp. 2d 866, 871 (N.D. Ohio 2012) (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). The non-movant must show "more than a scintilla of evidence to overcome summary judgment;" it is not enough to show that there is slight doubt as to material facts. *Zinn*, 885 F. Supp. 2d at 871 (quoting *Fulson*, 801 F. Supp. at 4). Moreover, the trial court does not have "a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citation omitted)).

### III.  LAW AND ANALYSIS

#### A. Sex Discrimination--Counts I and III

Defendant moves for summary judgment with respect to Plaintiff's Count I and III for Sex Discrimination on several bases. First, Defendant maintains that Plaintiff cannot demonstrate disparate pay under Title VII because she and her predecessor, Albaugh, performed different job responsibilities and that the GEMS coordinator position Plaintiff was hired for was subsequently re-classified nationally from a GS-12 to a GS-11 position before the start of her employment. (Mot. at PageID #156–58, ECF No. 27-2.) Next, Defendant contends that any negative performance results Plaintiff received—such as a negative midterm progress review, a letter of expectation, performance counseling letters, etc.—do not constitute materially adverse employment actions for the purposes of her discrimination claim. (*Id.* at PageID #158–160.) Third, Defendant argues that harassment is

-7-

a distinct theory of liability which Plaintiff failed to plead, stating that, "[t]o the extent that McKee argues that she suffered a hostile work environment as an "adverse action," she failed to plead such in her Complaint and cannot now raise it at the summary judgment stage." (*Id.* at PageID #160.) Defendant also asserts that it had legitimate justifications for its actions, and therefore Plaintiff cannot demonstrate pretext under the *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802–03 (1973), framework. (*Id.* at PageID #161–62.) Finally, Defendant argues that evidence related to other employees is irrelevant to Plaintiff's individual claim of discrimination, stating that, "McKee's attempts to prove her individual discrimination claim by relying on claims made by other individuals similarly fails" and that "because neither Jacqueline Hall nor Sarah Moose are parties in this action, McKee's allegations regarding Hall's complaints of race discrimination and Moose's various complaints are irrelevant to her individual claim of sex discrimination." (*Id.* at PageID #163–64.)

Plaintiff counters, broadly arguing that the court should deny Defendant's Motion because Plaintiff's sex discrimination claims are supported by evidence that establishes that there are genuine issues of material fact regarding such claims.  She cites the hostility to female employees, Plaintiff's reassignment, evaluations, and other individual facts in an attempt to demonstrate that there is a genuine issue of material fact. (Opp'n at PageID #804, ECF No. 31.) After considering the parties' arguments and relevant case law, the court finds Defendant's position well-taken. The court will address each argument in turn.

### A. Count III- Disparate Pay Under Title VII

With respect to Plaintiff's third Count for Pay Discrimination in violation of Title VII, Defendant argues that Plaintiff cannot demonstrate that she and Albaugh, who preceded her, were similarly-situated or performed the same work and therefore, "the record is clear that the discrepancy

between pay grade assigned to the EPS position McKee occupied and the position Albaugh occupied were based on factors unrelated to sex, but rather, the duties and responsibilities assigned to the position." (Mot. at PageID #157, ECF No. 27-2.) Furthermore, Defendant argues that the GEMS coordinator position had been nationally downgraded to a GS-11 position after Albaugh's departure, stating that, "no higher-graded EPS position existed at the Cleveland VAMC, and this was consistent with GEMS coordinator positions throughout the VA nationwide." (*Id.*) Finally, Defendant argues that Plaintiff's claim is undermined by the fact upon "McKee's departure, Albaugh was re-hired into the EPS position as a GS-11, and eventually replaced by a male who was also hired as a GS-11. Thus, that McKee was compensated at a GS-11 grade was due to business factors, unrelated to her sex . . . ." (*Id.* at PageID #157–158.)

Plaintiff argues that the record demonstrates genuine issues of material fact as to her disparate pay claim under Title VII. (Opp'n at PageID #808, ECF No. 31.) To bolster her proposition, Plaintiff states that the record demonstrates that she was told prior to applying that the GEMS position was compensated at a GS-12. (*Id.* at PageID #809.) Additionally, she states that there is a genuine issue of material fact because Defendant thwarted her efforts to perform a desk audit—a means to reevaluate whether a position is being properly classified at the appropriate GS level—stating that, "Harlach and Sabol both suggested she have a desk audit done but neither told her to initiate it through HR. In fact, both told her they would initiate the audit. Neither one did so." (*Id.*) Finally, Plaintiff argues that the record demonstrates a material dispute of fact as to whether her classification as a GS-11 was because of her sex because, "Defendant argues that the GEMS position was downgraded nationally to a GS-11 but there are two positions set at a GS-12 in the last year or so." (*Id.*)

-9-

Title VII provides that, "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1). The Sixth Circuit has held that, "[a] Title VII claim of wage discrimination parallels that of an EPA violation insofar as it incorporates the EPA's affirmative defenses." *Beck-Wilson v. Principi*, 441 F.3d 353, 369 (6th Cir. 2006) (citing *Washington County v. Gunther*, 452 U.S. 161, 167–171 (1981)). Therefore, an employer may avoid liability for Title VII wage discrimination if it can establish one of the four defenses outlined in the Equal Pay Act ("EPA"). *Id.*; *Odomes v. Nucare, Inc.*, 653 F.2d 246, 251 (6th Cir. 1981) ("The four exemptions enunciated by the Equal Pay Act are applicable to Title VII claims of unequal pay for equal work."). The EPA provides that an employer is not subject to liability if disparate payments are made pursuant to, "(I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. 206(d)(1). In a Title VII case, the plaintiff bears the burden of demonstrating that the defendant intentionally discriminated against her. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). A plaintiff may carry that burden by: "(1) introducing direct evidence which shows that in treating a plaintiff adversely, the defendant was motivated by discriminatory intent; or by (2) introducing circumstantial evidence that supports an inference of discrimination." *Storrs v. Univ. of Cincinnati*, 271 F.Supp.3d 910, 927–28 (S.D. Ohio 2017) (citing *Logan v. Denny's Inc.*, 259 F.3d 558, 566–67 (6th Cir. 2001)).

Plaintiff has not produced any direct evidence of pay discrimination on the basis of her sex. She also has not established prima facie evidence of discrimination. She has not put forth evidence

-10-

that would support a finding that the Secretary paid "different wages to employees of opposite sexes 'for equal work on jobs the performance of which require equal skill, effort and responsibility, and which are performed under similar working conditions.'" *Odomes v. Nucare*, 653 F.2d 246, 250 (6th Cir. 1981) (quoting Corning Glass Works v. Brennan, 417 U.S. 188, 195(1974)).   Here, the record is clear that Plaintiff and her predecessor, Albaugh, were not similarly situated in their job functions, and that the pay grade discrepancies were a result of differing job duties and responsibilities, not Plaintiff's gender. As to the different job responsibilities between Plaintiff and Albaugh, the record demonstrates that Albaugh's job responsibilities were broader than Plaintiff's.   Specifically, Albaugh's duties included the GEMS coordinator duties, as well as additional recycling and safety functions. The record also demonstrates that those responsibilities were spilt into two separate job positions: one GS-9 position in Environmental Management and one GS-11 position in OHS, Plaintiff's position. When Burke was asked the following question, she responded as indicated:

> Q:  Don Albaugh was a Safety Specialist . . . it was classified as a straight GS-12. When he left the job had been broken out into two Environmental Protection Specialists, a different series. And one was a GS-9 in Environmental Management, one was a GS-11 in Occupational Health and Safety.  The 11 was the job Melissa Holt had? A: Correct.

(Burke Tr. 86:6–87:3, ECF No. 27-6); (Harlach Tr. 36:19–37:17, ECF No. 27-4) (Harlach explaining that Albaugh had expanded responsibilities beyond Plaintiff's as a GS-12). Thus, it is clear that Plaintiff has not presented evidence to contradict these facts.  Plaintiff was hired to perform one aspect of Albaugh's former duties.  Therefore, her and Albaugh were not similarly situated in their job responsibilities.  Therefore, they are not comparators for purposes of determining whether any discrepancy in their pay was attributable to sex discrimination.  Furthermore, despite Plaintiff's

-11-

claim that she was previously told that the GEMS coordinator position was compensated at a GS-12, there is evidence that the GEMS coordinator position was nationally reclassified. For example, Charles Gray— former HR Specialist for the Cleveland Medical VA Center and former HR Consultant for VHA Central Office, Workplace Management and Consulting—stated that, "around 2015, across the country, the positions that contained the Green Environmental Management System (GEMS) coordinator duties at a facility level were reviewed and re-graded at the GS-11 level . . . Based on my review of the position, the OPM criteria, and comparable positions at other facilities, I graded the Environmental Protection Specialist as a GS-11." (Gray Decl. ¶ 13, ECF No. 27-5.) Moreover, despite Plaintiff's claims that she would be compensated at the GS-12 level, the record demonstrates that Defendant advertised the position as a GS-11. (GEMS Job Description, ECF No. 27-7.) Therefore, it is immaterial that Dan Mashek and Don Albaugh allegedly promised her that she would be promoted or compensated at the GS-12 level because the record is clear that neither Mashek or Albaugh determine compensation or job classification. (Burke Tr. 11:6-11:9, ECF No. 27-6) ("The position was classified prior to it being posted and it was classified as an 11.").

Furthermore, Plaintiff's claim that she suffered pay discrimination as a result of her gender is undermined by the fact that the position was posted as a GS-11 and that her subsequent replacements at the GEMS coordinator position were both men who were employed at the GS-11 level. (*Id.* 117:18–118:7, ECF No. 27-6) ( "Don Albaugh was hired as the GEMS Coordinator again after his retirement . . . Don Albaugh was a GS-11" and explaining that his replacement Ryan Carlo was also compensated at the GS-11 level, "Q: And is Ryan paid at the rate of an 11? A: He is."). Finally, the job postings that Plaintiff references to establish that Defendant hired others as a GS-12 fail to bolster her proposition because one is for an entirely different position, and the other is for a

GEMS position in California that does not identify whether it is a facility-level or higher-level GEMS position, which impacts an employee's GS level. (*See* Def.'s Reply Br., ECF. 34). Accordingly, the record is clear that Plaintiff's assignment to a GS-11-rated position was due to reasons other than sex. As a result, her claim for disparate pay under Title VII must fail. Therefore, the court grants summary judgment in favor of Defendant with respect to Plaintiff's third Count for disparate pay claim under Title VII.

### B. Count I-Sex Discrimination

A plaintiff may establish gender discrimination in two different ways. First, a plaintiff may offer direct evidence of the employer's discriminatory motives by producing "evidence, which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). Second, when unable to identify direct evidence of discriminatory motive, a plaintiff may offer indirect and circumstantial evidence under the *McDonnell Douglas* burden-shifting framework. *Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir. 2006). Under the *McDonnell Douglas* framework, in order to establish a *prima facie* case of gender discrimination under Title VII, a plaintiff must show that: "(1) he is a member of a protected class, (2) he was subject to an adverse employment action, (3) he was qualified for the position, and (4) he was treated differently than similarly situated employees outside the plaintiff's protected class." *McMillian v. Potter*, 130 F. App'x 793, 796 (6th Cir. 2005) (citing *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004)). Accordingly, an adverse employment action is essential for the survival of a plaintiff's gender discrimination claim. *Id.* Here, there is no question that Plaintiff, a female, is a member of a protected class.

### i. Adverse Employment Action

Plaintiff maintains that the following constitutes the adverse actions to which she was subjected....three main areas that she believes amount to adverse actions to which she was subjected : (1) reassignment into the Biomedical unit; (2) her evaluations, ROCs, and counseling letters; and (3) the terms of her new employment. (Opp'n at PageID #806–808, ECF No. 31.) Defendant argues that Plaintiff's alleged evidence of sex discrimination—her negative midterm progress review, letter of expectation, performance counseling letter, sick leave counseling, ROCs, negative performance evaluation, and reassignment of duties— are not "materially adverse employment actions for the purposes of a discrimination claim . . . ." (Mot. at PageID #158–60, ECF No. 27-2.) The Sixth Circuit has held that an adverse employment action constitutes, "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789, 798 (6th Cir. 2004) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).  An adverse employment action

is one that ordinarily "inflicts direct economic harm." *Burlington Indus.*, 524 U.S. at 762. Further, an adverse employment action must amount to "a materially adverse change" in the terms or conditions of a plaintiff's employment in order to be actionable. *Freeman*, 200 F. App'x at 442. The action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996). While a "*de minimis* employment" action is not materially adverse and therefore will not be considered actionable. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000), an employee need not suffer one

-14-

of the "ultimate employment actions" (e.g., termination, demotion, failure to promote, etc.) to have a viable discrimination claim. *Freeman*, 200 F.App'x at 442. Further, an adverse employment action "may consist of a less distinguished title, diminished options for advancement, or other unique indices." *Id.* (citing *Bowman*, 220 F.3d at 461–62.)  In making the required determination, an important consideration is whether a particular employment action was "objectively intolerable to a reasonable person." *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002). The court will address each of Plaintiff's alleged adverse employment actions.

First, with respect to Plaintiff's brief reassignment to the Biomedial unit, the Sixth Circuit has held that, "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Kocis*, 97 F.3d at 885. A reassignment may be considered an adverse employment action however, if it functions as a demotion as evidenced by, "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 886. Further, "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" *Burlington N.*, 548 U.S. 53, 59 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Here, the record demonstrates that Plaintiff was temporarily reassigned to the Biomedical engineering team as a result of her failure to complete assigned tasks crucial to OHS's safety standards. (Ex. Q, ECF No. 27-19) ("The purpose of this temporary assignment of duties is due to Ms. Holt's continued failure to complete assignments which has placed the Agency at risk of potentially violating occupational health and safety standards."). The record also indicates that Plaintiff's hours remained

-15-

the same, and that her pay was unaffected, which she acknowledged. (*Id.*); (*see also* Opp'n at PageID #806, ECF No. 31) (noting that the reassignment did not affect Plaintiff's pay). Further, there is evidence that Plaintiff's reassignment was a result of an increasing number of documented reports of contacts ("ROC"), and not Plaintiff's sex. (*Id.*); (McKee Tr. 176:8–176:25, ECF No. 27-3.) In the absence of evidence demonstrating that Plaintiff's reassignment resulted in salary or work hour changes, the court cannot conclude that Plaintiff's temporary reassignment constituted an adverse employment action. *See Kocsis*, 97 F.3d at 885; *Hillman v. Green Bay Packaging, Inc.*, No. 1:05-cv-320, 2006 WL 3524385, at *12 (S.D. Ohio Dec. 6, 2006) (determining that the plaintiff's temporary reassignment did not constitute an adverse employment action and stating that, "Plaintiff has presented no evidence showing that she lost pay or benefits as a result of being passed over for the temporary assignments. Therefore, she fails to establish a *prima facie* case on this claim.").

Next, Plaintiff alleges that her performance evaluation, ROCs, and counseling letters were discriminatory and constituted an adverse employment action. (Mot. at PageID #807, ECF No. 31.) Plaintiff maintains that many of Burke's grievances with her work product were not her responsibility, but instead the result of another employee's failure to perform their work adequately. (*Id.*) Generally, "a negative performance evaluation does not constitute an adverse employment action unless the evaluation has an adverse impact on the employee's wages or salary." *Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007). Thus, for a negative performance evaluation to constitute an adverse employment action, "the plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000). Similarly, a warning letter is not an adverse employment action on its own. There must be

-16-

some harmful consequence to a plaintiff's employment. *See Sanchez v. Brennan*, No. 1:19-cv-02133, 2021 WL 1634572, at *3 (N.D. Ohio Apr. 27, 2021) ; *McMillian*, 130 F.App'x at 798 (finding that a warning letter does not constitute an adverse employment action).

Here, the record is clear that Plaintiff received a performance counseling letter, sick leave counseling, and numerous ROCs as a result of sustained negative performance, all of which are functionally equivalent to warning letters. (Mot. at PageID #148–152, ECF No. 27-2.) Yet, the record also demonstrates that the performance counseling, warning letters and sick leave counseling did not result in any consequences for Plaintiff such as a suspension, reduction in salary, or further discipline. (Holt Tr. 138:11–139:6, ECF No. 27-3); (Burke Tr. 112:17–113:5, ECF No. 27-6) ("A Report of Contact is a way to initiate a conversation, or at least some writing about what's going on. All it's doing is relaying this is what occurred from my perspective or from emails that I have. There is nothing disciplinary associated with the issue of a Report of Contact.").  Accordingly, in the absence of tangible consequences as a result of the counseling and ROCs, and Plaintiff's failure to identify any consequences, the court finds that there is no genuine dispute of material fact that Plaintiff's performance counseling, ROCs, and sick leave counseling did not constitute adverse employment actions. *See also Sanchez*, 2021 WL 1634572, at *3. Finally, the court briefly notes that to the extent Plaintiff alleges a hostile work environment as an adverse employment action, her claim fails because a hostile work environment claim is a distinct theory of discrimination. *Smith v. Glenny Glass Co., Inc.*, No. 1:06cv638, 2007 WL 1202713, at *4 n.5; *National R.R. Passenger Corp. v. Morgan*, 537 U.S. 101, 115 (2002) ("Hostile environmental claims are different in kind from discrete acts [of discrimination or retaliation].."); *Harris v. Radioshack Corp.*, Nos. 01-5093-CIV-LENDARD, 01-5093-CIV-SIMONTON, 2002 WL 1907569 (S.D. Fl. May 23, 2002).  The record

-17-

is clear that Plaintiff did not ;ead a hostile environment claim in this case.

ii. Pretext

Furthermore, Plaintiff argues that the counseling, ROCs, and reassignment served as pretext for her discrimination. (*See generally* Opp'n, ECF No. 31.) Once a plaintiff meets their initial burden of demonstrating a *prima facie* case of discrimination under the *McDonnell-Douglas* framework, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action that, supported by evidence that, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)). The employee bears the burden of proving by a preponderance of the evidence "that the employer's proffered reasons were a mere pretext for discrimination." *Id.* Accordingly, when the burden shifts back to the plaintiff, "he must come forward with evidence that the defendant's reason for the employment action is false," but he "need not present independent evidence that the proffered reason is pretext for [ ] discrimination." *Id.* (citing *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003)); *Reeves v. Sanderson Plumping Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").  As discussed above, the employer has put forth evidence that the actions it took in temporarily reassigning Plaintiff, in counseling her, and otherwise as discussed above, were taken as a result of her negative work performance.

Plaintiff argues that all the evaluation, counseling letters, and ROCs are evidence of pre-text because she had been rated as an outstanding employee by Harloch and never received any

-18-

counseling prior to Burke taking over as head of the department. (Opp'n at PageID #806, ECF No. 31.) However, the record is clear that Burke's management style and expectations differed significantly from Harlach's (*see* Ex. R at PageID #756, ECF No. 27-20), and Plaintiff's "[c]omplaints about subsequent negative evaluations, though, can be better explained by performance deficits and possible change in management style, rather than by conspiracy." *Hopkins v. Canton City Bd. of Educ.*, No. 5:08 CV 2288, 2010 WL 2572830, at *10 (N.D. Ohio June 23, 2010), *aff'd* 477 F. App'x 349 (6th Cir. 2012). Furthermore, the record indicates that Plaintiff's performance was consistently found to be sub-par by multiple VA leadership. (Ex. O at PageID #749, ECF No. 27-17) (Sabol finding that a 2018 overall performance rating of unsatisfactory is warranted); (Ex. P at PageID #750, ECF No. 27-18) (Associate Director Lumia finding after Plaintiff's grievance proceedings that there was clear evidence of Plaintiff's performance deficiencies); (Ex. M, ECF No. 27-15) (collecting the ROCs that were submitted as a result of Plaintiff's work). The Sixth Circuit has found no pretext for discrimination where a plaintiff has repeatedly been cited for performance failures. *See Hairston v. AK Steel Corp.*, 162 F. App'x 505 (6th Cir. 2006) (affirming the district court's ruling on summary judgment in favor of the defendant because the plaintiff had not supported his race-discrimination claim with evidence from which a jury could conclude that the defendant's non-discriminatory reasons for firing him were pretextual when there was significant evidence of the plaintiff's poor work performance). Accordingly, Plaintiff's argument is unpersuasive.

Finally, Plaintiff contends that her October 2018 performance evaluation reassignment from "unacceptable" to "fully successful" demonstrates pre-text.   (Opp'n at PageID #808, ECF No. 31.) Specifically, Plaintiff states that:

> Defendant argues that it [sic] legitimate, non-discriminatory reasons for its various negative employment actions toward McKee. But when McKee appealed her evaluation, she was returned to "Fully Satisfactory" status, and many of the complaints Burke asserted were reversed by upper management. That alone indicates that Burke's rationale was faulty, if not pretextual.

(*Id.*) The record demonstrates that in October, 2018, Plaintiff received an "unacceptable" performance rating, with Burke noting that, "[d]uring the rating period, Melissa had many failures to carry out the critical element of her position as Environmental Protection Specialist." (Ex. N at PageID #743–46, ECF 27-16.) However, that rating was ultimately modified to "fully successful" by Beth A. Lumia as a result of a grievance process that identified clear job performance deficiencies. (Ex. P at PageID #750–51, ECF No. 27-18.) However, Plaintiff fails to demonstrate how her evaluation performance rating can properly be considered pretext. Plaintiff has not identified how Burke's initial rating was false, and the record suggests that there was some basis for her initial performance determination as the grievance report found clear evidence of Plaintiff's performance deficiencies. Accordingly, the court determines that Plaintiff has failed to demonstrate pretext and therefore, the court finds that there is no genuine dispute of material fact as to pretext.

### iii. Similarly-Situated

The last requirement that a Plaintiff must show to establish a *prima facie* case of discrimination is that she was treated worse than a similarly-situated non-protected employee. However, "[b]efore the plaintiff can compare his treatment to that of a non-protected employee, the plaintiff must "show that the comparables are similarly-situated in all respects."" *Anderson v. Potter*, No.: 1:06 CV 508, 2008 WL 11480551, at *5 (N.D. Ohio June 24, 2008) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). In *Mitchell*, the court held that:

> the individuals with whom the plaintiff seeks to compare his/her treatment

must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.*

Next, Defendant argues that it is entitled to summary judgment because Plaintiff cannot demonstrate that she was treated differently than similarly-situated employees. (*See* Mot. at PageID #163, ECF No. 27-2.) Specifically, Defendant states that, "[i]n her attempt to put forth a prima facie case of discrimination situated [sic], Plaintiff alleges that she was treated differently than Dan Mashek, David Quibbel, and Don Albaugh. However, none of these employees were similarly-situated to her." (Reply at PageID #979, ECF No. 34.) Plaintiff disputes Defendant's assertion and states that no employee was treated similarly to her and cites to specific examples that she believes illustrate disparate treatment. (Opp'n at PageID #807, ECF No. 31.)

Here, the record demonstrates that the employees that Plaintiff compares herself to are not similarly situated. All three male employees that Plaintiff highlights had different job titles and responsibilities. (*See* Mot. at PageID #143, ECF No. 27-2; Ex. B, ECF No. 27-4.) Furthermore, as discussed above, Albaugh's position and responsibilities were significantly broader than Plaintiff's, thereby making his employment uncomparable to hers. Moreover, Plaintiff fails to submit evidence that Mashek, Quibbel or Albaugh were subject to the same amount of ROCs and counseling that Plaintiff received. *See Mitchell*, 964 F.2d at 583 (finding that the plaintiff had failed to show that she was similarly situated to two other employees because she had not shown that their offenses were comparable to hers). Plaintiff attempts to bolster her claim by alleging that Hall and Moose, other female employees, were also discriminated against and reported Mashek for his alleged sexist remarks and behavior. (Opp'n at PageID #807, ECF No. 31.) However, neither Hall and Moose are

-21-

parties to Plaintiff's action, and the "pattern-or-practice" method of proving discrimination is unavailable to an individual plaintiff. *See Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004) (holding that the pattern-or-practice method of proving discrimination is not available to individual plaintiffs). Accordingly, Plaintiff has failed to demonstrate that she was treated differently than similarly-situated employees. Therefore, the court finds that there is no genuine dispute of material fact as to Plaintiff's gender discrimination claim.

### C. Retaliation Claims

Defendant moves for summary judgment with respect to Plaintiff's Count Two for Reprisal, arguing that: (1) even if Plaintiff could satisfy the first three elements of a retaliation claim, she cannot establish a casual connection between any protected activity and the alleged action; and (2) Plaintiff cannot show that Defendant's legitimate, nondiscriminatory reasons were pretextual. (Mot. at PageID #164–65, ECF No. 27-2.) Plaintiff counters, stating that, "[s]he began advocating for herself to receive the GS-12 level and bad things started to happen even more." (Opp'n at PageID #811, ECF No. 31.) Furthermore, Plaintiff maintains that her reassignment was pretextual and that, "[w]hile there is no 'threat of discharge' here, that direct evidence does not always exist. In this instance the facts show a pattern by higher ups at the VA to sweep their problems under the proverbial rug, but never to actually solve them." (*Id.* at PageID #812.)

A plaintiff "may prove unlawful retaliation by presenting direct evidence of such evidence or by establishing a *prima facie* case under the *McDonnell Douglas* framework." *Abbott v. Crown Motor Co.*, 348 F.3d 538, 542 (6th Cir. 2003). The Sixth Circuit has held that, "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008). Because Plaintiff does not offer direct

evidence of her alleged retaliation, the court must evaluate the claim under the *McDonnell Douglas* framework. *Abbott*, 348 F.3d at 542. Accordingly, to establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate that: "(1) [Plaintiff] engaged in activity protected by Title VII; (2) Defendants knew that Plaintiff engaged in the protected activity; (3) Defendant took an action that was 'materially adverse' to Plaintiff, and (4) a causal connection existed between the protected activity and the materially adverse action." *Weeks v. Michigan, Dept. of Cmty. Health*, 587 F.App'x 850, 858 (6th Cir. 2014) (citing *Laster*, 746 F.3d at 730). If a plaintiff satisfies this requirement, the burden shifts back to the defendant to identify a non-retaliatory explanation for its actions. *Serrano v. Cintas Corp.*, 699 F.3d 884, 893 (6th Cir. 2012). If the defendant satisfies that requirement, the burden shifts back to the plaintiff to demonstrate that the defendant's explanation was pretextual and that the adverse employment action was a result of retaliation. *Id.*; *Dean-Lis v. McHugh*, 598 F. App'x 412, 414 (6th Cir. 2015).

### i. Causal Connection

With respect to causal connection, Defendant maintains that the alleged retaliatory actions Plaintiff complains of relate to her work performance in 2018, and not as a result of Plaintiff's complaints about her paygrade as a GS-11 because "the EOC ["Environment of Care"] meeting occurred prior to any of McKee's protected activity relating to her complaints of gender discrimination, which according to McKee's account would have been June 27, 2019 at the earliest." (Mot. at PageID #165–66, ECF No. 27-2.)

In regard to the causal connection element of retaliation, the Supreme Court has held that Title VII retaliation claims "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the

alleged wrongful action or actions of the employer." *Univ. Of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). The Sixth Circuit has held that to establish a casual connection, a plaintiff "must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott*, 348 F.3d at 543.  One way a plaintiff may demonstrate a casual connection is to show "close temporal proximity between the adverse employment actions and the protected activity." *Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013) (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009)). Although "temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).

Plaintiff posits that she was illegally retaliated against after she complained about her pay rate being different from her male predecessor's. (*See* Compl. ¶ 20, ECF No. 1.) According to Plaintiff, there was a shift in the OHS environment beginning after the EOC committee meeting, where Plaintiff's work product was discussed as being lacking. (McKee Tr. 77:19–77:25, 83:25–84:10 ECF No. 27-3) ("Q. Okay. When did you feel things started changing? A. It was after an EOC committee meeting, May I believe 25th Thursday was, 2018.") The record reflects that Plaintiff engaged in her protected activity on August 27, 2018, when she filed her complaint with the Office of Resolution Management ("ORM"), alleging that she felt she was a victim after she initially spoke with Burke regarding her pay in June, 2018.  (Ex. K; Ex. H at PageID #679, ECF No. 27-10.) While there is proximity between her complaint to Burke and her filing with the ORM, again her complaint to Burke came before the protected activity.  Further, Plaintiff fails to show a causal connection

-24-

because, as discussed above, Plaintiff has not identified any adverse employment actions taken against her. The record demonstrates that her temporary reassignment, performance counseling, and further counseling were a result of Plaintiff's poor performance, which is well documented. *See infra II*. Furthermore, *arguendo*, if Plaintiff was able to establish a claim for retaliation, Defendant has produced evidence rebutting the  presumption as it produced legitimate and nondiscriminatory evidence of Plaintiff's workplace failures. *See Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 544 (6th Cir. 2008) (citing *McDonnell Douglas Corp.*, 411 U.S. 792) (noting that the burden "shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for its action.").  Plaintiff has not shown that the legitimate, non-discriminatory reason established by Defendant was a pretext for discrimination; she has not shown that the reason was false and that sex discrimination was the real reason.  Therefore, the court finds that there is no genuine issue of material fact regarding Plaintiff's retaliation claim, and therefore grants summary judgment in favor of Defendant as to Plaintiff's Count III for reprisal.

## IV.  CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment (ECF No. 27).

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE


September 30, 2022